# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **WILLIAM J. PREAU, III** | **CIVIL ACTION** |
| **VERSUS** | **No. 09-4252** |
| **ST. PAUL FIRE AND MARINE INSURANCE COMPANY** | **SECTION I** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Bench trial commenced and concluded on Monday, July 26, 2010. Pursuant to Federal Rule of Civil Procedure 52(a)(1), the following represents the Court's findings and conclusions.

### *BACKGROUND*

Dr. William J. Preau, III ("Preau") was a member of Lakeview Anesthesia Associates ("LAA"), an anesthesia practice group at Lakeview Medical Center ("LMC") that employed five anesthesiologists. Dr. Robert Lee Berry ("Berry") was also an LAA member. In early 2001, LMC's pharmacy director became suspicious of the inordinate quantities of demerol requested by Berry. Apart from Berry, the pharmacy director met with all of LAA's anesthesiologists and voiced his concern. Not only had Berry withdrawn large amounts of demerol, but a significant amount of the withdrawn demerol was unaccounted for in hospital records. Following this meeting, Preau and his partners met with Berry and questioned him about his demerol withdrawals. Preau testified that Berry was explicitly asked whether he was diverting demerol for his own personal use. According to Preau, Berry denied abusing the drug and stated that was just the way that he practiced.[1] Preau took Berry at his word.

On March 13, 2001, Berry was on call at LMC. Although Berry was supposed to

---

[1] In contrast to Preau and his other partners who generally had nurses administer narcotics to patients pursuant to physician instructions, Berry often personally administered narcotics to patients.

1

respond to patients' anesthesia needs, a nurse found him sleeping in the break room. He was groggy when the nurse woke him. When questioned by LMC staff and his LAA partners about the incident, Preau recalled at trial that Berry admitted that he had passed out after taking valium that day. LAA never allowed Berry to return to work.

Following the March 13 incident, Preau spoke with Berry. According to Preau, Berry told him that he had taken the valium because he was struggling with back pain and depression. Preau told Berry that he needed to get help.

On March 27, 2001, LAA terminated Berry's employment "with cause." In a letter signed by all LAA members, including Preau, LAA stated, "[a]s we have discussed on several occasions, you have reported to work in an impaired physical, mental, and emotional state. Your impaired condition has prevented you from properly performing your duties and puts[2] our patients at significant risk."

Notwithstanding this termination letter, on June 3, 2001, Preau wrote a letter of recommendation for Berry in which Preau described Berry as "an excellent anesthesiologist" whom Preau recommended "highly." Although the Court found Preau's testimony at trial to be, at least in part, self-serving and less than credible, Preau claims that he felt confident writing the letter because Berry had assured him during a telephone conversation that he had seen physicians for his back pain and depression and that he had controlled both ailments with medication. Once again, Preau apparently took Berry at his word.

In part because of this letter, Berry began working as an anesthesiologist at Kadlec Medical Center ("KMC"). Tragically, while working at KMC on November 12, 2002, Berry allegedly caused a patient, Kim Jones, to suffer extensive brain damage when he failed to ensure

---

[2] Preau claimed that he understood "puts" to refer only to the danger in which Berry placed patients on March 13, 2001, when Berry passed out after allegedly taking valium. The Court found this testimony to be less than credible.

that she received enough oxygen while anesthetized.  Berry signed a statement admitting that he was under the influence of drugs when he anesthetized Kim Jones.

Ms. Jones's family filed a medical malpractice lawsuit ("the Jones' litigation") against Berry and KMC, which KMC settled for 7.5 million dollars.  In turn, KMC and its insurer sued LAA, the individual members of LAA, including Preau, and LMC asserting claims for intentional misrepresentation, negligent misrepresentation, strict responsibility misrepresentation, and negligence.

Following a jury trial, on May 26, 2006, the jury found Preau and other defendants liable for intentional misrepresentation and negligent misrepresentation.  Preau alleges that, as a result of the Kadlec litigation, he personally paid KMC $758.630.05.

On May 29, 2009, Preau filed a lawsuit against his general liability insurer, St. Paul Fire and Marine Insurance Company ("St. Paul"), alleging that St. Paul "had in effect a policy of insurance insuring [Preau] against this risk."  Preau seeks to recover the full amount he paid to KMC.[3]

St. Paul asserts that the policy does not provide Preau coverage for his payments to KMC.  Essentially, St. Paul contends that Preau paid KMC damages only for the economic harm his letter caused the hospital.  Because Preau's policy does not cover payments for economic harm, St. Paul argues that it is not bound to reimburse Preau.  Alternatively, St. Paul argues that even if Preau paid KMC damages for bodily injury, the policy's exclusions preclude Preau from recovering such payments from St. Paul.

## *LEGAL STANDARDS AND ANALYSIS*

---

[3] In denying the parties' motions for summary judgment, the Court found that Preau would be unable to recover any portion of his payment to KMC or its insurer that did not represent, at least in part, damages paid for bodily injury. See Amended Order and Reasons, R. Doc. No. 48, n. 19.

## I. Interpretation of Louisiana Insurance Contracts

"An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code. Cadwallader v. Allstate Ins. Co., 848 So. 2d 577, 580 (La. 2003); see also id. ("The judiciary's role in interpreting insurance contracts is to ascertain the common intent of the parties to the contract.") (citing La. Civ. Code art. 2045).[4] "Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court." Amoco Prod. Co. v. Tx. Meridian Res. Exploration Inc., 180 F.3d 664, 668 (5th Cir. 1999). "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. "A contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." Amoco Prod., 180 F.3d at 668-69 (quoting Tx. Eastern Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 741 (5th Cir. 1998)) (internal quotation marks omitted). "In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." Id. at 669.

Pursuant to Louisiana law, "[w]ords and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." Cadwallader, 848 So.2d 577, 580 (La. 2003). A court should not, however, interpret an insurance contract "in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or to restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion." Id. "If the policy

---
[4] The parties do not dispute that Louisiana law applies to the insurance policy at issue in this case.

4

wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written." Id.

If there is any doubt or ambiguity as to a provision in an insurance contract, Louisiana law applies a rule of "strict construction" that requires that any doubt or ambiguity in an insurance contract be construed in favor of coverage to the insured and against the insurer who issued the policy. Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So. 2d 759, 764 (La. 1994); see also La. Civ. Code art. 2056 ("In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text."); accord Valentine v. Bonneville Ins. Co., 691 So. 2d 665, 668 (La. 1997); Crabtree v. State Farm Ins. Co., 632 So. 2d 736, 741 (La. 1994). If an ambiguity exists, a court should "construe the policy 'to fulfill the reasonable expectations of the parties in the light of the customs and usages of the industry.'" Louisiana Ins. Guar. Ass'n, 630 So. 2d at 764 (quoting Trinity Indus., Inc. v. Ins. Co. of N. America, 916 F.2d 267, 269 (5th Cir. 1990)); see Breland v. Schilling, 550 So. 2d 609, 610-11 (La. 1989) ("Ambiguity will also be resolved by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered.").

While the insured bears the burden of proving the existence of the policy and coverage, i.e. the "requirements" for coverage, Tunstall v. Stierwald, 809 So. 2d 916, 921 (La. 2002) (citing Collins v. New Orleans Pub. Serv., Inc., 234 So. 2d 270 (La. App. 4th Cir. 1970)), the insurer bears the burden of proving the existence of policy limits or exclusions. Tunstall, 809 So. 2d at 921 (citing Mass. Protective Ass'n v. Ferguson, 168 La. 271, 121 So. 863 (La. 1929)

**II.     Financial v. Bodily Injury**

Throughout the pretrial phase and trial, St. Paul contended that Preau is not entitled to coverage under the policy because he seeks to recover for a "financial injury" that is not a covered loss.[5] This Court rejected that argument in its order and reasons denying cross motions for summary judgment.[6] St. Paul adduced no evidence at trial calling that conclusion into doubt. Accordingly, for reasons previously set forth by this Court,[7] St. Paul's argument is rejected.

### III. Intended or Expected Bodily Injury

St. Paul argues that the policy's intended or expected bodily injury exclusion bars Preau's recovery. Preau's policy contains the following exclusion:

> **Expected or intended bodily injury or property damage.** We won't cover bodily injury or property damage that's expected or intended by the protected person. Nor will we cover medical expenses that result from such bodily injury.[8]

In Louisiana, an "intended or expected bodily injury" exclusion is ambiguous when it references the insured's subjective viewpoint. Pique v. Saia, 550 So. 2d 609, 655 (La. 1984) (clause excluding coverage for "bodily injury ... which is either expected or intended from the standpoint of the Insured" held to be ambiguous). Such policy language has been construed to exclude coverage only for intended injuries. Id. Further, the Louisiana Supreme Court has held that such clauses exclude coverage only when the insured intends the injury itself to occur, rather than when the insured merely causes the injury through an intentional act. Breland v. Schilling, 450 So. 2d 654, 612 (La. 1989). As the Louisiana Supreme Court explained in Breland:

> The phrase "bodily injury ... which is expected or intended," emphasizes that an excluded injury is one which the insured <u>intended</u>, not one which the insured <u>caused</u>, however intentional the injury-producing act. The next phrase, "from the standpoint of

---
[5] R. Doc. No. 25-4, p. 8.
[6] <u>See</u> Amended Order and Reasons, R. Doc. No. 48.
[7] <u>Id.</u>
[8] R. Doc. No. 27-5, p. 56.

> the Insured," emphasizes again that it is the insured's subjective intention and expectation which delimit the scope of the exclusion. The subjective intention and expectation of the insured determine which injuries fall within and which fall beyond the scope of coverage under this policy.

Breland, 450 So. 2d at 611.

In Great American v. Gaspard, 608 So. 2d 981 (La. 1992), the court, adopting Justice Lemmon's concurrence in Breland, held that "[t]he insured's subjective intent or expectation must be determined not only from the insured's words before, at the time of, and after the pertinent conduct, but from all the facts and circumstances bearing on such intent or expectation." Great American, 608 So. 2d at 986 (quoting Breland, 550 So. 2d at 614-15) (Lemmon, J.) (concurring) (internal citations and quotation marks omitted). Nevertheless, the court emphasized that "the test is whether at the time [the insured acted] he intended [the resulting injury] or had a subjective belief that such a result was certain or substantially certain to follow." Id. at 986. In other words, Breland holds that an insured's coverage is excluded when the insured subjectively desires an injury or knows, in effect, that the injury is inevitable.[9]

---

[9] The Breland court further noted:

> We hold, therefore, that when minor bodily injury is intended, and such results, the injury is barred from coverage. When serious bodily injury is intended, and such results, the injury is also barred from coverage. When a severe injury of a given sort is intended, and a severe injury of any sort occurs, then coverage is also barred. But when minor injury is intended, and a substantially greater or more severe injury results, whether by chance, coincidence, accident, or whatever, coverage for the more severe injury is not barred. Whether a given resulting bodily injury was intended "from the standpoint of the insured" within these parameters is a question of fact. Such factual determinations are the particular province of the trier of fact, in this instance the trial jury.
>
> The terms of this insurance contract dictate that the insured's subjective intent regarding bodily injury, as measured by the fact finder, controls whether coverage applies. . . .

Breland, 550 So. 2d at 614.

In this case, the intended or expected injury clause does not preclude Preau's coverage because Preau did not intend injury or harm to happen to anyone, especially Kim Jones. Furthermore, Preau was not substantially certain any injury would occur. To be sure, this observation does not absolve Preau of moral culpability. As the Kadlec jury and Fifth Circuit found, Preau committed the tort of intentional misrepresentation and that tort was in part responsible for in Kim Jones' tragic injury and KMC's great economic loss. Nevertheless, based on the facts presented to this Court, Preau's moral culpability does not limit his ability to recover from St. Paul a portion of the damages he paid to KMC.

The bottom line is that intent to deceive does not necessarily equate to intent to cause injury or harm. Although harm occurred as a result of Preau's intentional misrepresentation, harm was not the object of his actions. By forcing Preau to pay damages to KMC, the Kadlec jury, in effect, found Preau liable for Kim Jones' bodily injury. Under Louisiana law, Preau's insurance policy requires St. Paul to indemnify Preau unless it can show that Preau intended an injury or knew that an injury was inevitable.[10] Given the testimony adduced at trial, this Court cannot conclude that Preau, in writing the recommendation letter, intended any injury to occur or that Preau had a subjective belief that injury was certain or substantially certain to follow.

In the Court's view, Preau's decision to write Berry's recommendation letter was manifestly unreasonable and reckless in light of all of the circumstances, including his knowledge that Berry had "passed out" after taking valium, awareness that Berry had withdrawn demerol that was unaccounted for, and the letter that Preau signed acknowledging that Berry

---

[10] Preau testified credibly to the fact that he knew Berry had handled "thousands" of cases over the years without incident and that no complaints were ever lodged against Berry prior to the March 13, 2001. In fact, Preau asked Berry to perform an epidural for Preau's wife. Preau further testified that, outside of the March 13, 2001 incident, he never thought Berry seemed impaired either at work or during their limited social interactions outside work. These facts make St. Paul's burden of establishing Preau's intention to cause or substantial certainty of causing injury more difficult.

posed a "significant risk" to patients. Further, given the risks inherent in improperly anesthetizing a patient, there was a high probability that Berry, an anesthesiologist with at least one documented incident of drug-induced impairment, would eventually injure a patient. However, as stated previously, St. Paul must show that Preau set out to cause an injury or believed that causing such an injury was inevitable. St. Paul has not met this burden. Accordingly, the intended or expected bodily injury provision does not limit Preau's ability to recover the damages he paid to KMC.

**IV.    Other Exclusions**

In its motion for summary judgment, St. Paul argued that three other policy provisions prevent Preau from recovering.[11] The Court denied St. Paul's motion, finding that material issues of fact existed as to whether these exclusions operated against Preau. At trial, St. Paul produced no evidence tending to prove that these policy provisions barred Preau's recovery. Accordingly, for reasons stated by the Court in connection with the motions for summary judgment,[12] these provisions do not prevent recovery.

**V.     Prejudgment Interest**

Finally, the parties dispute the appropriate measure of prejudgment interest. It is a "longstanding [principle of] Louisiana jurisprudence" that prejudgment interest runs from the date of judicial demand. Trans-Global Alloy Ltd. v. First Nat. Bank of Jefferson Parish, 583 So. 2d 443, 457 (La. 1991). Accordingly, interest shall accrue from May 29, 2009, the date Preau filed this suit in state court.

*CONCLUSION*

---

[11] See Amended Order and Reasons, R. Doc. No. 48. St. Paul argued that Preau was not a "protected person" under the policy, the policy's "health care services" exclusion applied, and that Preau's failure to notify St. Paul of the Jones litigation precluded recovery.

[12] See Amended Order and Reasons, R. Doc. No. 48.

**IT IS ORDERED** that judgment be entered in favor of plaintiff, William J. Preau, III in the amount of $502,650.42[13] plus pre-judgment interest as set forth in La. R.S. 13:4202[14] and any post-judgment interest that accrues pursuant to 28 U.S.C. § 1961.[15]

New Orleans, Louisiana, July 29, 2010.

_____
 LANCE M. AFRICK
 UNITED STATES DISTRICT JUDGE

---

[13] This figure represents the principal amount Preau paid KMC and its insurer for the harm resulting from Kim Jones' bodily injury after subtracting interest and the portion of the payment representing the costs and fees of KMC and its insurer. The parties agree that nine percent is the correct figure to use when calculating such fees and costs. Further, the Court was presented with no convincing argument as to why Preau should recover the interest he paid to KMC and its insurer.

[14] "The rate of legal interest that applies from the time of [] judicial demand [is] determined by the Louisiana Office of Financial Institutions under La. R.S. 13:4202." See Bank One, N.A. v. A. Levet Properties Partnership, No. Civ.A. 03-1373, 2004 WL 1661204 at *4 (E.D. La. July 22, 2004) (Vance, J.).

[15] Travelers Ins. Co. v. Liljeberg Enterprises, Inc., 7 F.3d 1203, 1209 (5th Cir. 1993) ("The majority of the circuits have held that the federal postjudgment interest statute, 28 U.S.C. § 1961, applies to any judgment in a civil case recovered in a district court, including actions based on diversity of citizenship.")